Case 4:24-mc-00101-WEJ   Document 1   Filed 10/11/24   Page 1 of 18

Hist. Cell Site SW; Rev. 5/19

FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: Oct 11 2024

KEVIN P. WEIMER, Clerk

By: Kari Butler
Deputy Clerk

# UNITED STATES DISTRICT COURT

Northern District of Georgia

In the Matter of the Search of:

**Information associated with the cellular device assigned 770-238-8657 that is stored at the premises controlled by Verizon**

**APPLICATION & AFFIDAVIT FOR SEARCH WARRANT**

CASE NUMBER: 4:24-MC-101

I, Frank Hutson, depose and say under penalty of perjury as follows:

I am a(n) Special Agent of the ATF, and have reason to believe that in the property described as:

- **Information associated with the cellular device assigned 770-238-8657 that is stored at the premises controlled by Verizon, 180 Washington Valley Rd. Bedminster, NJ 07921,**

there is now concealed certain property, certain data, and certain information, namely:

**See Attachment A**

that constitutes evidence of the commission of a criminal offense, concerning violations of Title 18, United States Code, Section(s) 924(c) and 1951, over which the United States District Court for the Northern District of Georgia has jurisdiction. *See* 18 U.S.C. §§ 2703(c)(1)(A), 2711(3)(A); FED. R. CRIM. P. 41.

The facts to support a finding of Probable Cause are as follows:

**SEE ATTACHED AFFIDAVIT.**

*Frank Hutson*
Signature of Affiant
ATF Special Agent Frank Hutson

Sworn to me by telephone pursuant to Federal Rule of Criminal Procedure 4.1.

| October 11, 2024 | at | Rome, Georgia |
|---|---|---|
| Date | | City and State |

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

*Walter E. Johnson*
Signature of Judicial Officer

AUSA Calvin A. Leipold, III / 404-581- 6258 / calvin.leipold@usdoj.gov

## **AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

I, Frank Hutson, depose and say under penalty of perjury as follows:

### A. Agent Experience

1. As a Special Agent for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7). Therefore, I am empowered to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 26 of the United States Code.

2. Prior to being employed with ATF, I was a student at Texas Christian University where I received a bachelor's degree in criminal justice. As a criminal justice student, I studied topics that included constitutional law, crime scene investigations, and the judicial process.

3. As an ATF Special Agent, I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center and have completed specialized training in the fields of firearms, explosives and arson, and the federal laws and regulations pertaining thereto, through the ATF Special Agent Basic Training Academy. I am assigned to Atlanta Group IV, where my primary duties include the investigation and enforcement of violations of firearms laws and associated violations encountered in the course of these duties. I also assist as needed with investigations in other areas of ATF's primary jurisdiction, including arson and explosives violations.

4. I have authored affidavits, probable cause statements, and written reports during the course of investigations I have worked. I have also participated in the service of subpoenas, search warrants, and I have participated in the collection of evidence at search warrants.

5. Through my training and interaction with other agents, I am familiar with many of the traditional investigatory methods, including visual surveillance, electronic surveillance, informants, witness and subject interviews, and undercover operations.

**B. Subject Telephone**

6. Pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), I submit this Affidavit in support of a warrant for information and data associated with the:

- *Subject Telephone*: a Verizon cellular telephone assigned phone number 770-238-8657, believed to be used by Tyrane HUDSON.

I believe the information associated with the Subject Telephone is stored at premises controlled by wireless telephone service provider, Verizon, located at 180 Washington Valley Rd. Bedminster, NJ 07921. As a result, this affidavit is made in support of an application for a search warrant requiring Verizon to disclose subscriber and cell site information (as fully described in Attachment A).

I submit that probable cause exists to believe that violations of 18 U.S.C § § 924(c) and 1951 have been committed by Tyrane HUDSON. As a result, probable cause also exists to search the information and data associated with the Subject Telephone for evidence, instrumentalities, and fruits of these crimes.

**C. Cellular Telephones & Cell Site Data**

7. Based on my training and experience, I have learned that individuals who participate in crimes often use cell phones and online tools to facilitate and plan their criminal activity and to avoid detection by law enforcement. Likewise, I have

learned that individuals commonly use cell phones before, during, and after criminal activity to coordinate the commission of those crimes.

8. In my training and experience, I have learned that Verizon is a telecommunications company that provides cellular telephone access to the public. Further, I know that wireless providers such as Verizon, typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method/s of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as Verizon typically collect and retain information about their subscribers' use of the wireless service, such as records about calls, text messages, and data transmissions sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crime/s under investigation because the information can be used to identify the Subject Telephone's user or users and may assist in the identification of co-conspirators and/or victims.

9. In addition, I know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the physical location of the cellular telephones to which they provide service. I know that Verizon can collect cell site data (also known as tower/face or cell tower/sector information).

10. Cell site data identifies the cell towers (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the cellular phone and, in some cases, identifies the sector (*i.e.*, faces of the towers) to which the phone connected. Even in urban areas, these towers are often a half-mile or more apart

and can be 10 or more miles apart in rural areas. Further, the tower closest to a wireless device does not necessarily serve every call made to or from that device. I know that for each transmission a cellular device makes, its wireless service provider can typically determine: (a) the date and time of the communication; (b) the telephone numbers involved, if any; (c) the cell tower to which the customer connected at the beginning of the communication; (d) the cell tower to which the customer connected at the end of the communication; and (e) the duration of the communication. I also know that wireless providers (such as Verizon), usually collect and retain cell site data for cellular devices to which they provide service in the normal course of their business.

11. On September 13, 2024, Sean McArthur, a detective with the Cartersville Police Department, submitted a preservation request for the cell site data relating to the Subject Telephone described in Attachment A. The request was made for the time period of July 1, 2024, through August 23, 2024.

12. Finally, I know that many cell phone service providers in the ordinary course of business maintain more precise location information that tends to approximate a cell phone's location and/or range from accessed cell towers and sectors during a call or data transmission. In the telecommunication industry, this type of information is generically known as "advance timing data" – but is also referred to as Network Event Location Operating System, per call measurement, Real Time Tool/RTT, or timing advance data.

**D. Sources of Information**

13. The information set forth in this affidavit is based on: (a) my personal observations and knowledge, (b) my training and experience, (c) information obtained from other individuals participating in the investigation, (d) reports and/or business records, (e) recorded conversations or text messages, and (f) communications with other individuals who have personal knowledge of the events

and circumstances described herein. Since this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included in this affidavit every detail of the investigation. Rather, I have set forth facts that I believe are sufficient to establish probable cause for the issuance of the requested search warrant. Unless specifically indicated otherwise, any conversations and statements described in this affidavit are related in substance and in part only.

**E.   Probable Cause Basis**

<u>Officers Respond to Armed Robbery</u>

14.   On Thursday, August 22, 2024, at approximately 12:45 A.M. Officers with Cartersville Police Department's Uniform Patrol Division responded to 1204 West Avenue, a Citgo gas station, in reference to an armed robbery in progress.

15.   Upon arrival, officers spoke with the clerk of the store. They stated an unknown individual entered the store at approximately 12:30 A.M., pointed a gun at their back and directed them to empty the register and gambling machines. The clerk stated they produced $550 from the register and told the suspect they didn't have the key to open the gambling machines. Following the robbery, the clerk stated they saw the suspect exit the store and walk behind a neighboring business known as Martin's Restaurant. Shortly thereafter, the clerk saw a silver sedan with black rims exit the parking lot of Martin's and drive away.

16.   Following the officer's initial arrival on scene, the clerk provided officers with the security footage of the store for the timeframe surrounding the robbery. Upon reviewing the security footage, officers observed an individual, later determined to be WILMORE, enter the store at approximately 12:30 A.M.  Officers observed WILMORE wearing a dark hooded jacket, dark ski mask with a single eye opening, dark pants, and red and black Nike Air Jordan style shoes enter the store and direct the store clerk to the register. WILMORE pulls a black semi-automatic

5

handgun with a silver ejection port from his jacket pocket and points it at the clerk. WILMORE takes the $550 from the clerk, exits the front door of the gas station and walks to the neighboring parking lot. Officers observed a vehicle, matching the description the clerk provided, leave the Martin's Restaurant parking lot at approximately 12:36 A.M.

17. While reviewing the video surveillance preceding the robbery, officers located footage of two patrons visiting the store in a silver Chevy Malibu with black rims. The clerk informed officers the silver Chevy Malibu was the same vehicle he observed fleeing the scene following the robbery. Officers observed the Chevy Malibu pull into the Citgo parking lot at approximately 11:26 P.M. and then two males exit the vehicle and enter the store. While in the store, one of the individuals purchases an item. Shortly after, officers observe the two males exit the store, re-enter the Malibu and subsequently leave the parking lot at approximately 11:28 P.M. Soon thereafter, officers observed the vehicle pull into Martin's parking lot next door. Upon reviewing surveillance footage, at approximately 11:30 P.M., officers observed the vehicle lights turn off and the vehicle was not seen leaving until just after the robbery took place.

18. Utilizing investigative resources made available to law enforcement, to include but not limited to open-source databases, agents identified the two males observed on the security footage as Mabery WILMORE and Tyrane HUDSON. Agents identified the silver Chevy Malibu utilized in the robbery to be registered to WILMORE. Agents identified the car dealership that sold WILMORE the car and were able to obtain WILMORE's cell phone number from the Bill of Sale. The phone number associated with WILMORE on the sale was 470-767-6323.

19. Agents identified HUDSON's phone number after learning he was on probation. Agents contacted HUDSON's probation officer and were provided with

HUDSON's phone number, which is 770-238-8657 (Subject Telephone).

20. Following the identification of HUDSON and WILMORE, agents learned HUDSON has been arrested approximately 60 times for crimes including Battery, Cruelty to Children, Home Invasion, and Drug Trafficking. Additionally, HUDSON has been convicted of more than 15 felony crimes, including Possession of Controlled Substances, Escape, and firearms related crimes. WILMORE has been arrested approximately 7 times and convicted of 3 misdemeanors counts of Simple Battery relating to domestic violence.

## Arrest of HUDSON

21. State arrest warrants were obtained for WILMORE and HUDSON for Armed Robbery. On August 22, 2024, agents located HUDSON at his residence, 89 Sharp Way Cartersville, Georgia. While conducting surveillance, agents observed HUDSON exit the residence, get into a Chevy Malibu which was parked in the driveway, and leave. Subsequently, the vehicle was traffic stopped and HUDSON was arrested. Agents searched the vehicle pursuant to HUDSON's arrest and found approximately 4.6 grams of Fentanyl, 42 grams of a crystal-like substance believed to be Methamphetamine, and a digital scale commonly used for weighing controlled substances.

22. A search warrant was obtained for HUDSON's residence, and an additional 17.7 grams of suspected Methamphetamine and several Oxycodone Hydrochloride pills were located inside the residence.

## Interview of HUDSON

23. HUDSON voluntarily participated in a post *Miranda* interview at the Cartersville Police Department. During the interview, officers showed HUDSON a photo and HUDSON identified the individual as WILMORE. HUDSON explained

he and WILMORE traveled to the Citgo gas station on West Avenue at approximately 11:30 P.M. where HUDSON made a purchase while inside. HUDSON consented to having agents look through his phone messages with WILMORE. Agents discovered WILMORE's contact information saved in HUDSON's phone as "MJ" with 470-767-6323 listed as the phone number. Between June 5 and August 22, 2024, there were 96 phone calls exchanged between HUDSON and WILMORE.

### Arrest of WILMORE

24. Later on August 22, 2024, agents located the 2014 Chevrolet Malibu registered to WILMORE that was used in the robbery, parked in front of the Ten 68 West apartment complex in Dallas, Georgia. While waiting for WILMORE to access the vehicle, agents observed the operator of a tow truck repossess the vehicle. Agents followed the vehicle out of the area to a safe location, interdicted it, and held it while they applied for a search warrant.

25. While agents were waiting for the search warrant of the vehicle, agents observed WILMORE exit an apartment and get into the passenger seat of a brown Nissan Altima. Agents observed the Altima leave the area driven by a female, later identified as Cambree Stanley, WILMORE'S girlfriend. Once it was determined that the vehicle was in a safe location, agents stopped the vehicle and arrested WILMORE. Cambree Stanley consented to a search of the vehicle which yielded WILMORE's cell phone and approximately $248 in cash found in the console.

26. Following WILMORE's arrest, agents returned to apartment #427, where WILMORE had been staying with Cambree Stanley. Upon arrival, agents were provided voluntary consent to search the apartment from both Cambree Stanley and her father, later identified as Jerome Stanley. Upon searching, agents located a pair of red and black Air Jordan shoes matching the description of the shoes WILMORE wore during the robbery. Agents also located a pair of all white, low-cut

sneakers, which WILMORE wore at the Citgo, prior to changing into the red and black Jordan's he wore during the robbery.

27. Agents then obtained a search warrant for the 2014 Chevrolet Malibu registered to WILMORE and searched the vehicle. They located a black Taurus model PT111 semi-automatic pistol hidden behind the radio head unit. The firearm is black and has a silver ejection port. This firearm's size and color is consistent with the firearm depicted in the surveillance videos from the robbery. In addition, magazines for the Taurus pistol were located inside a duffel bag in the trunk of the vehicle as well as the jacket WILMORE wore during the robbery.

### Interview of WILMORE

28. WILMORE was transported to Cartersville Police Department and participated in a post *Miranda* interview. During the interview, WILMORE admitted to knowing HUDSON and indicated they traveled around the Cartersville area for several hours selling drugs prior to the robbery. WILMORE said he and HUDSON went to the Citgo gas station, and after leaving the store, HUDSON asked WILMORE to participate in robbing the store to which WILMORE agreed. HUDSON directed WILMORE to park in an establishment next to the gas station, known to agents as Martin's Restaurant. WILMORE changed clothes and entered the Citgo to commit the robbery. Once the robbery had been completed, WILMORE returned to the vehicle and got in the front passenger seat. As HUDSON drove away, WILMORE claimed he provided HUDSON with some of the proceeds.

### Agent's Review of Security Footage to Verify Statements

29. Following the interview, agents reviewed the security footage to verify both WILMORE's and HUDSON's statements. Upon review, agents observed the previously mentioned sequence of events, which included WILMORE and HUDSON traveling to the Citgo gas station and HUDSON making a purchase

9

shortly before the robbery. Following the purchase, WILMORE and HUDSON were seen entering their vehicle and driving away. A short time later, agents observed a vehicle matching the description of WILMORE's Chevy Malibu pull into Martin's Restaurant, next door to the Citgo gas station. Agents then observed WILMORE commit the robbery, exit the store, and return to Martin's parking lot. After WILMORE had returned to the parking lot, the vehicle then drove away. The agents' observations aligned with both WILMORE's and HUDSON's statements.

### Agents Identify Additional Armed Robberies

30.     On October 2, 2024, agents from ATF, Floyd County Police Department, Rome Police Department, Cartersville Police Department, and Dallas Police Department met to discuss numerous commercial business robberies that had recently occurred in the area.

31.     On July 11, 2024, an armed robbery occurred at a convenience store located at 2527 Shorter Ave. SW Rome, GA 30165, where $600 was stolen.

32.     On August 4, 2024, an armed robbery occurred at a convenience store located at 408 S Broad St Rome, GA 30161. Between $2,600 and $3,800 was stolen.

33.     On August 5, 2024, an armed robbery occurred at Ronda's Food Mart, located at 1203 Cave Spring Rd SW Rome, GA 30161, where approximately $2,600 was stolen.

34.     On August 22, 2024, an armed robbery occurred at the Citgo gas station located at 1204 West Avenue Cartersville, GA 30120, where approximately $550 was stolen. This is the same incident as the one that has been mentioned throughout this affidavit.

35.     After reviewing surveillance video from each incident, agents observed a single gunman wearing similar clothing in each robbery, including the Citgo

robbery. The gunman wore a dark jacket with the hood flipped up, dark pants, and a dark ski mask with a single eye opening.

36.     For the robberies that occurred on July 11, August 4, and August 5, in addition to the similar clothes, the gunman was observed wearing a pair of all white, low-cut sneakers during the robberies. Agents observed the white shoes worn in these robberies to be similar to the shoes that WILMORE wore when he was in the Citgo, prior to the robbery on August 22.

37.     In addition to apparel, the gunman was seen in each incident wielding a similar style and color semi-automatic pistol. For the robberies that occurred on July 11, August 5, and August 22, agents observed the gunman holding a black pistol with a silver ejection port. This firearm is consistent with the Taurus pistol found inside WILMORE's Chevy Malibu. As for the August 4 robbery, agents observed a similar black pistol, but were not able to clearly observe the silver ejection port due to the poor quality of the video.

## Review of T-Mobile and Verizon Phone Records

38.     Cartersville Police Department personnel obtained a warrant for cell phone records from T-Mobile for WILMORE's phone and a warrant for cell phone records from Verizon for HUDSON's phone. Cartersville PD obtained data from August 1 through August 22 and this time period does not include the July 11 robbery. At the time that Cartersville PD requested the data, they were unaware of the additional robberies.

39.     Upon reviewing this data from T-Mobile, agents learned WILMORE's phone was at the August 4, August 5, and August 22 robberies at the time they occurred. The Verizon data also shows HUDSON's cell phone near the Citgo when the robbery happened.

40. On August 4, cell phone data shows HUDSON in the Rome area. Specifically, HUDSON's cell phone interacted with a tower approximately a half mile south of the robbery location. HUDSON's phone is seen in the area from approximately 12:30 A.M. to 3 A.M. During the time of the robbery, which occurred around 4:00 A.M., HUDSON's phone does not interact with any towers. This suggests that HUDSON turned his phone off or put it in airplane mode at the time of the incident. I know, based on my training, experience, and conversations with other agents, that it is common for individuals to turn their cellular devices off or leave them at a certain location to help mask any criminal activity.

41. On August 5, HUDSON's cell phone data shows HUDSON to be in the Rome area, the night of the robbery. HUDSON's phone interacted with a tower in North Rome at approximately 9:00 P.M. HUDSON's phone does not interact with any towers at the time of the robbery, which occurred around 10:15 P.M. Again, this suggests that HUDSON turned his phone off or put it in airplane mode at the time of the incident.

42. For both August 4 and August 5, the towers that HUDSON's phone interacted with are approximately 20 miles from his home.

43. Based on these factors, including the geographical proximity of each incident, agents believe all the robberies listed above were committed by the same individual(s). Further, I believe that the requested data will help show that HUDSON and his cell phone were present at the robbery on July 11, or that HUDSON turned off his phone to attempt to avoid creating evidence of his presence at the robbery.

**F. Conclusion**

44.     I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41**.** I further request that the Court direct Verizon to disclose to the ATF any information described in Attachment A for the time period July 1, 2024 to September 1, 2024 that is within its possession, custody, or control.  Given that the warrant will be served on Verizon, who will then compile the requested records at a time convenient to it, good cause exists to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Rev. 11/22 (Hist. Cell Site Aff.)

# **ATTACHMENT A**

**Information to be disclosed by Service Provider & seized by the United States**

For the account identified as and/or associated with:

- *Subject Telephone*: a Verizon cellular telephone assigned phone number 770-238-8657, believed to be used by Tyrane HUDSON.

The provider, or any other entity providing wire or wireless communication service in the United States whose assistance may facilitate execution of the warrant, is required to disclose to the government the following records and information associated with the account, if available, for the time period from July 1, 2024 to September 1, 2024:

1. Names (including subscriber names, user names, and screen names);

2. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

3. Local and long distance telephone connection records and/or call, text message, and data transmission detail records;

4. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol addresses) associated with those sessions;

5. Length of service (including start date) and types of service utilized;

6. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers, Mobile Electronic Identity Numbers, Mobile Equipment Identifier, Mobile Identification Numbers, Subscriber Identity Modules, International Mobile Subscriber Identifiers, or International Mobile Equipment Identities);

7. Other subscriber numbers or identities (including the registration Internet Protocol address);

8. Means and source of payment for such service (including any credit card or bank account number) and billing records;

9. Historical cell site/sector data, including: (a) the cell sites to which the Subject Telephone sent its signal when a call, text message, or data transmission was made, placed, or received; (b) the cell sites through which the call or data transmission were routed when the call or data transmission ended; and (c) the cell sites during a call or data transmission, if available; and

10. Historical advance timing data (also called Network Event Location Operating System, per call measurement, Real Time Tool/RTT, or timing advance data) stored in the ordinary course of business that tends to approximate the Subject Telephone's location and/or range from accessed tower and sectors.

2

The provider shall also provide an engineering map showing cell-site tower locations, sectors, and orientations. All records described above shall be provided in an electronic format within 10 days of the date of this warrant and shall be accompanied by a Business Records Certification.

The provider shall also provide an engineering map showing cell-site tower locations, sectors, and orientations. All records described above shall be provided in an electronic format within 10 days of the date of this warrant and shall be accompanied by a Business Records Certification.